# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

_____  )
                                            )
JENNA ZINGG,                                )
                                            )
    *Plaintiff,*                            )
    v.                                      )
                                            )   Civil Action No. 15-10771-ADB
THOMAS GROBLEWSKI and                       )
MASSACHUSETTS PARTNERSHIP                   )
FOR CORRECTIONAL HEALTHCARE,                )
                                            )
    *Defendants.*                           )
_____  )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## INTRODUCTION

The Court should deny Defendants' Motion for Partial Summary Judgment because there are disputed facts about the medical justification for Ms. Zingg's treatment and about Dr. Groblewski's state of mind. Accepting Ms. Zingg's version of the facts, a jury could find that Dr. Groblewski knowingly denied Ms. Zingg any effective treatment for her severe and worsening condition.

Dr. Groblewski is liable for his actions and his failure to act with respect to Ms. Zingg's medical care—specifically, his decision as to what medication she would receive. MPCH is liable for the actions of Dr. Groblewski because he was the entity's final decisionmaker with respect to requests for non-formulary medications like Humira. Dr. Groblewski's decision to deny Humira or an appropriate alternative medication to Ms. Zingg

represented MPCH "policy" for purposes of liability under *Monell. See Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008).

## FACTS

Plaintiff relies on and respectfully refers the Court to Plaintiff's Statement of Facts ("PSOF") and Plaintiffs' Response to Defendants' Rule 56.1 Statement of Material Facts ("PRDSOF").

## ARGUMENT

### I.  Summary judgment standard

Summary judgment is appropriate only when there are no disputes as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The facts must be considered in the light most favorable to the nonmoving party, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), and all justifiable inferences must be drawn in her favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). The district court's role is limited to assessing whether there exists "evidence [] such that a reasonable jury could return a verdict for the nonmoving party." *Perry v. Roy,* 782 F.3d 73, 78 (1st Cir. 2015).

### II.  Dr. Groblewski's denial of any effective treatment to Ms. Zingg violated her constitutional right to adequate medical care

#### A.  Deliberate indifference standard

As a pretrial detainee, Ms. Zingg had a right to adequate health care under the Due Process Clause of the Fourteenth Amendment. *Perry,* 782 F.3d at 78; *Consolo v. George*, 58 F.3d 791, 794-95 (1st Cir. 1995). Prison doctors violate this right when they "exhibit deliberate indifference to a detainee's serious medical needs." *Perry,* 782 F.3d at 78 (citations and internal quotation marks omitted). To prove a violation, a plaintiff "must satisfy both of

2

two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek v. Spencer,* 774 F.3d 63, 82 (1st Cir. 2014) (en banc).

Under the objective prong, "[a] medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Leavitt v. Corr. Med. Servs.,* 645 F.3d 484, 497 (1st Cir. 2011). The subjective prong requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citation and internal quotation marks omitted). "[W]here 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,' the deliberate indifference standard has been met." *Id.* (citations omitted). "[A] deliberate intent to harm is not required." *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). "Rather, it is enough for the prisoner to show a wanton disregard sufficiently evidenced 'by denial, delay, or interference with prescribed health care.'" *Id.* (citation omitted).

Defendants concede that Ms. Zingg had a serious medical need requiring treatment, Defs.' Mem. at 14. Indeed it was. Before her incarceration in 2013, Ms. Zingg had a long, well-documented history of severe psoriasis, coupled with probable psoriatic arthritis. *PSOF at ¶¶ 2, 6-7, 15*. Although well-controlled on Humira when she entered Framingham, without this medication her condition deteriorated. *Id. at ¶¶ 12, 15, 36*. When Dr. Groblewski denied Humira after several months of treatment with a high-potency topical medication had failed, it was obvious that her condition was severe and painful, and that she required the Humira

that her primary provider had prescribed or another systemic medication. *Id. at ¶¶ 41, 9-10, 36*. Dr. Groblewski's refusal to provide any appropriate care caused more than three weeks of additional, intensifying suffering that ultimately required inpatient hospitalization. *Id. at ¶¶ 45-60*.

Because the seriousness of Ms. Zingg's condition is uncontested, this memorandum focuses on the subjective prong of the deliberate indifference standard.

> **B.    Dr. Groblewski showed deliberate indifference because it was obvious that continued use of topicals would be ineffective**

When Dr. Groblewski denied Humira, Ms. Zingg's need for this medication or another systemic medication was obvious. The non-formulary request made apparent that Ms. Zingg's condition was severe and worsening and that continuing with topical treatments would fail. *Id. at ¶¶ 78-79*. Dr. Groblewski's decision to deny Humira and approve only Dovonex effectively denied Ms. Zingg any treatment. *Id. at ¶ 81*.

Based on the information in PA Casella's non-formulary request for Humira, Dr. Groblewski knew that she had a history of moderate to severe psoriasis. He knew that at the time of the request she had plaque lesions on her elbows and "severe psoriasis covering 90%" of her proximal inner things, vulva, and perirectal area. *Id. at ¶ 36*. He knew that she had been taking clobetasol .05% cream for several months since being incarcerated, but that her psoriasis was worsening. He knew that she was having joint pain. Dr. Groblewski knew that she had been prescribed Humira in the community. And he knew that PA Casella, who had been treating Ms. Zingg for months, had concluded that she needed Humira. *Id. at ¶ 36*.

Dr. Groblewski knew that the symptoms mentioned in the non-formulary request were indications of severe psoriasis. He knew that the presence of psoriasis in the genitals

4

would render the condition more severe, as would the presence of psoriasis in the inner thighs, buttocks, and the groin area generally—areas where the request form stated Ms. Zingg had severe psoriasis covering 90% of her skin. *Id. at ¶ 83*. Dr. Groblewski also knew that the greater the surface area of the body covered by psoriasis, the more severe the condition. *Id. at ¶ 83*.

Any doctor regardless of specialty would know from the non-formulary request that systemic treatment was necessary. *Id. at ¶ 79*. It was obvious that Dovonex, a very mild topical medication, would not be effective since clobetasol, a much more potent topical medication, had failed. *Id. at ¶ 77*. As Plaintiff's expert, Dr. Merola, stated, "this would be the equivalent of shooting a pistol at an armored car after a missile had failed." *Id. at ¶ 81*. The foregone conclusion that Dovonex would not work makes this case more than a mere "dispute over the exercise of professional judgment" about the proper course of treatment; prescribing Dovonex was "so clearly inadequate as to amount to a refusal to provide essential care." *Leavitt,* 645 F.3d at 503*; see also McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("[W]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.")(citation omitted).

### C. Dr. Groblewski showed deliberate indifference by failing to obtain more information about Ms. Zingg before denying her treatment

If Dr. Groblewski considered the information in the non-formulary request insufficient to justify Humira, he had an obligation to gather more information before denying the request without offering any suitable alternative. *Id. at ¶¶ 44, 72*. His denial of Humira without examining Ms. Zingg, reviewing her medical records, or otherwise obtaining any information about Ms. Zingg indicates a lack of concern about her treatment. *Id. at ¶¶*

5

*69,72-73; PRDSOF at ¶ 91*. This indication is strengthened by the fact that PA Casella, who had much greater information about Ms. Zingg, had concluded that Humira was necessary. *PSOF at ¶¶ 35-36, 75-76*.

Dr. Groblewski admitted that the general practice standards for psoriasis involved "first assessing the patient and obtaining prior medical records." *Id. at ¶ 70*. He knew that assessing the severity of the patient -is necessary to determine the appropriate level of treatment. *Id. at ¶ 70*. Dr. Groblewski stated that assessing the severity required obtaining the patient's history and talking to her, examining her, measuring the size her psoriatic lesions, evaluating her response to current therapies, and checking for secondary infections. *Id. at ¶ 71*.

PA Casella, Ms. Zingg's primary care provider, had done these things. PA Casella had seen Ms. Zingg for months, and seen her condition deteriorate, until she came to the conclusion that Ms. Zingg needed Humira. *Id. at ¶¶ 21-36*. Defendants admit that PA Casella was "attentive to Ms. Zingg by repeatedly evaluating her and appropriately escalating her treatment." Defs.' Mem. at 16. Dr. Groblewski trusted PA Casella and considered her to be a good provider. He cannot recall ever disagreeing with her clinical judgment. *Id. at ¶ 40*. Yet Dr. Groblewski overruled PA Casella's considered medical determination without consulting her. *Id. at ¶¶ 41-43*.

Dr. Groblewski knew that PA Casella had obtained records showing that Ms. Zingg had been on Humira in the community. *Id. at ¶ 36*. As Dr. Groblewski repeatedly points out, this medication is not prescribed lightly. Insurance companies are unlikely to approve Humira unless a doctor has proven its necessity. *PRDSOF at ¶ 18*. Defendants' expert, Dr.

Amit Garg, agrees. *Id. at ¶ 116.* Dr. Groblewski's awareness that Ms. Zingg had been prescribed Humira in the community and was taking it when she was admitted to Framingham was a clear sign that she would need it in Framingham when the psoriasis became more severe. *Id. at ¶¶ 91, 115. PSOF at ¶ 36.*

Dr. Groblewski admitted that when he reviews a medication request, "his responsibility is to approve the request as presented, or to define an alternative as measured against the formulary or standard practice guidelines, or to request additional information to support the request." *PRDSOF at ¶ 114.* He did none of these things in denying the request for Humira. *PSOF at ¶ 73.* As discussed above, Dovonex was not an equivalent or acceptable alternative under well-established practice standards.[1] *Id. at ¶¶ 77-78, 81, 86.* Dr. Groblewski thus had an obligation to request additional information before making a determination about the request. He had done so on other occasions but gives no explanation why he did not seek further information here. *Id. at ¶ 44.*

A jury could conclude from Dr. Groblewski's unjustified failure to gather more information about the need for Humira that he did not care about providing Ms. Zingg with treatment appropriate to her needs. *See Leavitt,* 645 F.3d at 498 ("A prison official 'would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.") (citing *Farmer,* 511 U.S. at 843 n.8)).

Finally, Dr. Groblewski's insistence that he was not Ms. Zingg's treating doctor confirms the inappropriateness of his decision to overrule the judgment of the provider who

---

[1] Nor was it appropriate even under MPCH's own protocols, as discussed below.

7

was treating her. *Id. at ¶ 66*. As a medical doctor who had the sole authority to decide whether Ms. Zingg could receive a prescribed non-formulary medicine, *id. at ¶ 38*, he cannot disclaim responsibility for his decision by claiming he made it "in his role of utilization review." *Defs.' Mem. at 16*. *See Sildack v. Corizon Health, Inc.,* No. 11-12939, 2014 U.S. Dist. LEXIS 121801, at *18-19 (E.D. Mich. Sep. 2, 2014) (denying summary judgment to non-treating, non-examining medical director who decided "to implement an 'alternative' plan of treatment … completely contrary to the treating recommendations that Plaintiff required more aggressive care"), *report and recommendation adopted,* 2014 U.S. Dist. LEXIS 138878 (E.D. Mich. Sep. 30, 2014). Dr. Groblewski contradicts this claim by admitting that the denial of Humira and approval of Dovonex were "clinical decisions." *Defs.' Mem. at 15; see also PRDSOF at ¶ 92* (citing Dr. Groblewski's answer to interrogatory stating that he denied Humira "for clinical reasons").

### D. Dr. Groblewski's alleged reasons for denying Humira are not credible and do not justify his decision

Dr. Groblewski's justifications for his actions rely on disputed facts; they do not negate the evidence of his deliberate indifference. Whether his denial of Humira was medically defensible is contested. Plaintiff disputes that the MPCH plaque psoriasis protocol was consistent with nationally accepted standards and that following it would have been medically appropriate. *PRDSOF at ¶ 115*. Plaintiff also disputes that Dr. Groblewski correctly applied the protocol in any event. *Id. at ¶ 91*. A jury could also reject Dr. Groblewski's other justifications for denying Humira, some of which are based on factors Dr. Groblewski was unaware of when he made his decision. *Id. at ¶ 92; PSOF at ¶ 73*.

Dr. Merola's expert report and testimony support a jury finding that Dr. Groblewski's decision to limit Ms. Zingg to topical medicine was directly at odds with nationally accepted, published treatment recommendations for psoriasis and psoriatic arthritis. *Id. at ¶ 86*. A jury could find that Dr. Groblewski's refusal to approve appropriate treatment on July 15, 2013, when Ms. Zingg's condition was already severe and getting worse, caused her condition to decline to the point where it required hospitalization, on August 9, 2013. *Id. at ¶¶ 41, 58-60*. Dr. Groblewski's decision caused needless physical and emotional suffering that was easily avoided. *Id. at ¶ 95*.

Dr. Groblewski's purported reliance on the MPCH protocols was unjustified. The protocol is not within the standard of care for psoriasis. The protocol's requirement of Dovonex (or another topical) after an inadequate response to a high-potency topical steroid is not medically sound, as discussed above.[2] *PRDSOF at ¶ 115*.

Further, the protocol's rigid requirement to follow the same steps regardless of the severity of the disease or the presence of psoriatic arthritis is improper and is directly at odds with nationally accepted treatment guidelines. *PSOF at ¶¶ 85-86*. Dr. Groblewski was aware that the severity of the patient's condition is a necessary factor to consider when determining appropriate treatment. *Id. at ¶ 84*. But he admitted that regardless of how severe a person's disease, and regardless of the presence of psoriatic arthritis, he would require the patient to start at the beginning of the protocol. *Id. at ¶ 85*. Prescribing a very mild topical when someone has a severe disease for which they had been taking systemic medication goes against accepted dermatological practice and guidelines. *Id. at ¶¶ 9, 81*. And psoriatic arthritis

---

[2] It is also inconsistent with protocols followed by health insurance plans in the community. *PRDSOF at ¶ 115*.

9

cannot be treated by topical means; it requires systemic treatment. *Id. at ¶ 82*. This one-size-fits-all approach is not consistent with basic medical practice. *Id. at ¶ 86*.

Courts have repeatedly found deliberate indifference based on doctors' inflexible adherence to treatment protocols or formularies without consideration of whether they were medically appropriate in a particular case. *See, e.g., Johnson v. Wright,* 412 F.3d 398, 406 (2d Cir. 2005) (doctors denied treatment based on DOC practice guideline without taking "any steps whatsoever to assure themselves that applying the Guideline in plaintiff's case was, in fact, a medically justifiable course of action"); *Grawcock v. Hodges*, No. 10-CV-345-RLM, 2012 U.S. Dist. LEXIS 109890 at *4 (N.D. Ind. Aug. 6, 2012) (nurse denied pain medication "based on a policy rather than on her medical assessment of whether [plaintiff] required it. This deflates [defendant's] argument that she couldn't have been deliberately indifferent because she provided some pain medication, even if not the proper kind. Instead, it tends to show that [defendant] didn't [make] a medical decision at all.").[3]

In any event, Dr. Groblewski did not correctly follow the protocols. Ms. Zingg *had* tried and failed at least two topical ointments, including Dovonex—as her outside medical records showed, as PA Casella was aware, and as her treating dermatologist stated in a letter sent to Framingham that was made part of Ms. Zingg's medical file. Dr. Groblewski would have known this had he inquired into Ms. Zingg's medical history. *PRDSOF at ¶ 91*.

---

[3] *See also Foster v. Enenmoh*, No. 1:08-cv-01849, 2013 U.S. Dist. LEXIS 108941, at *30 (E.D. Cal. Aug. 1, 2013) (denying summary judgment to doctor who "knew that Metamucil was effective in treating [plaintiff's] constipation and that other treatments were not effective, but [] nonetheless denied [plaintiff] access to Metamucil because of its exclusion from the formulary."), *report and recommendation adopted,* 2013 U.S. Dist. LEXIS 138884 (E.D. Cal., Sept. 26, 2013).

Dr. Groblewski's alleged concern about the risk of infection from Humira does not support his decision. The risk of infection with anti-TNF agents such as Humira is only "slightly increased." *PSOF at ¶ 13*. Dr. Merola testified that they have been used widely, routinely, and safely in patients for over a decade. *Id. at ¶ 13*. Serious side effects from Humira are "very rare." *PRDSOF at ¶ 11*. Further, other prisoners in DOC facilities had received Humira—by Defendants' count, there were 70 new prescriptions in 2013—yet Dr. Groblewski was unaware of any infections that were caused as a result of the patients' lowered immune systems. *Id. at ¶ 11*. Nor did Ms. Zingg have any infection when PA Casella prescribed Humira that warranted its denial; PA Casella did not think so, and Dr. Merola agrees. *Id. at ¶ 126; PSOF at ¶ 36*.

Regardless, Dr. Groblewski could not have been concerned about any risks of infection to Ms. Zingg since he did not have her records or obtain her history. *Id. at ¶ 73*. Dr. Groblewski was also unaware of other factors he now cites as support for his decision, including Ms. Zingg's alleged noncompliance with past medical visits, the fact that she had gone on and off Humira at different times, or the fact that Humira did not always provide 100% clearance of her skin. *Id. at ¶ 73*. These purported reasons for denying care had no bearing on Dr. Groblewski's state of mind at the time of the decision. *See, e.g., Duran v. Merline,* 923 F. Supp. 2d 702, 731 (D.N.J. 2013) (rejecting "post hoc justification for the denial of treatment, as evidenced by the complete absence of this assessment in [plaintiff's] medical records"); *Delker v. Maass,* 843 F. Supp. 1390, 1396 n.1 (D. Or. 1994) ("The use of this dubious argument suggests post-hoc efforts by defendants to justify a decision that was actually made for other reasons, and casts a shadow upon the other explanations offered by

defendants."). Dr. Merola testified that none of these factors justified withholding Humira, nor did they affect the treatment decision of PA Casella, who had reviewed Ms. Zingg's history.[4] *Id. at ¶36; PRDSOF at ¶¶ 34, 124, 125.*

Finally, Defendants' claims that Dr. Groblewski encouraged PA Casella to contact a dermatologist after the denial of Humira, and that he approved PA Casella's later request for a dermatology referral, are disputed. Dr. Groblewski has no memory of any such conversation, and there is no record of it in Ms. Zingg's file; nor is there any record that Dr. Groblewski was involved in approving the August 1 referral, which was approved because it met MPCH's standard algorithm for such referrals. *PSOF at ¶ 55; PRDSOF at ¶ 67.*

Even if a jury were to believe that Dr. Groblewski took these alleged actions, it could still find deliberate indifference based on the needless delay that he caused in Ms. Zingg's treatment. There is no record of when the alleged conversation between Dr. Groblewski and PA Casella took place; the attempts she made to contact Dr. Asvadi, supposedly as a result of this conversation, did not occur until July 26–eleven days after Dr. Groblewski's denial of Humira. *Id. at ¶ 67; PSOF at ¶ 47.* The referral request was not approved until August 6, more than three weeks after the denial. *Id. at ¶ 55.* During this time, Ms. Zingg's condition worsened and her physical and emotional suffering dramatically increased, as is well documented in the record. *Id. at ¶¶ 45-57.* Her eventual receipt of proper treatment after being admitted to the hospital on August 9 does not absolve Dr. Groblewski of his

---

[4] Similarly, Dr. Groblewski's contention that he denied Humira because Ms. Zingg had supposedly not tried methotrexate is not credible. There is no contemporaneous record that he ever considered this, and he admits that he did not know whether she had tried this in the past. *PRDSOF at ¶ 92.* She had tried it unsuccessfully. *Id. at ¶¶ 47, 80.* Dr. Groblewski also did not claim he considered methotrexate in an answer to an interrogatory asking why he denied Humira. *Id. at ¶ 92.*

responsibility for causing her condition to deteriorate for weeks. *See Perry,* 782 F.3d at 81 (rejecting contention "that the fact that Perry received some treatment, including eventually being transferred to a hospital, shows that his serious medical needs were not ignored"); *see also Edwards v. Snyder*, 478 F.3d 827, 832 (7th Cir. 2007) (holding that plaintiff's eventual receipt of adequate care does not defeat claim of deliberate indifference based on "delayed treatment, the justification for that delay, and the resulting harm"). Ms. Zingg's history of responding well to Humira, and her rapid and significant improvement after receiving Humira at the Shattuck, show that this harm was "easily preventable." *Perry,* 782 F.3d at 81.

### E. A jury could infer Dr. Groblewski denied Humira because of its cost

Facts in the record permit the inference that Dr. Groblewski denied Humira for financial reasons. *Id. at ¶¶ 88-93*. Evidence of withholding necessary care to save costs supports a finding of deliberate indifference. *Leavitt*, 645 F.3d at 498. Such evidence may be circumstantial. *Id.*

Humira is expensive. It costs approximately $2,500 a month, which is much greater than the cost of topical medications such as Dovonex and clobetasol. *PSOF at ¶ 17*. PA Casella told Ms. Zingg that Humira would not be approved because it cost $1,000 per shot. *Id. at ¶ 88*. Dr. Groblewski also knew that Humira was expensive and knew of the importance of cost containment to his employer, a private for-profit corporation. *Id. at ¶¶ 88, 93, 94*. One of his job responsibilities as medical director was "to direct sensible utilization of resources while helping to establish and monitor budgets." *Id. at ¶ 90*. Another responsibility was to contain the cost of pharmaceutical expenditures. *Id. at ¶ 91*. Dr. Groblewski attended monthly "utilization review" meetings at which a representative of one

13

of MPCH's parent companies would give a slide-show presentation about medication costs; issues addressed included the number of non-formulary requests and the cost of particular medications including Humira. *Id. at ¶ 91.* In 2013, the time period at issue in this case, Dr. Groblewski spoke every month with MPCH's parent company's national director of pharmaceuticals, Gregg Puffenberger, about the cost of medications. *Id. at ¶ 92.* Under its contract with DOC, MPCH received a fixed amount of compensation for pharmaceutical expenditures; every dollar MPCH spent on medications directly affected its bottom line. *Id. at ¶ 93.*

From the above, a jury could conclude that Dr. Groblewski made his decision to deny Humira not for bona fide medical reasons but for financial ones. Indeed, he admits he denied the medication "in his role of utilization review." *Defs.' Mem. at 16.* While this does not absolve him of his responsibility as a medical doctor deciding what care Ms. Zingg would receive, it suggests his true motivation. Coupled with the absence of any legitimate medical reason to deny Humira, the above supports a finding of deliberate indifference.

### III. Defendant Groblewski is not entitled qualified immunity

#### A. Qualified immunity is not available to Dr. Groblewski, a private actor

Dr. Groblewski cannot raise qualified immunity as a defense. He primarily relies on *Frazier v. Bailey*, 957 F.2d 920 (1st Cir. 1992), to argue the defense is available, but *Frazier* is no longer good law. Frazier's holding that private actors can assert qualified immunity when they are "the functional equivalent of public officials," *id.* at 929, has been eschewed by the Supreme Court.

In *Richardson v. McKnight*, 521 U.S. 399 (1997), the Supreme Court addressed whether private prison guards are entitled to assert qualified immunity as a defense in § 1983 suits. The Court expressly rejected the guards' argument that being the functional equivalent of publicly employed prison guards entitles them to assert qualified immunity. "The Court has sometimes applied a functional approach in immunity cases, but only to decide which type of immunity—absolute or qualified—a public officer should receive. … [I]t never has held that the mere performance of a governmental function could make the difference between unlimited § 1983 liability and qualified immunity." *Id.* at 408 (citations omitted).

Rather than look at a defendant's public function, the Court relied on two factors to conclude that private prison guards cannot assert qualified immunity. First, the Court assessed whether there was a "firmly rooted tradition of immunity" applicable to private prison guards. *Id.* at 404–05. The Court found no such tradition, noting instead that private prison employees historically have been amenable to suit. *Id.* Second, the Court examined whether the historical purpose of qualified immunity would be served by extending it to private prison guards. It concluded that "ordinary marketplace pressures" accomplish many of the same functions as qualified immunity (such as avoiding "overly timid, insufficiently vigorous, unduly fearful, or non-arduous employee job performance"), *id.* at 409–10, and thus found no reason to expand the scope of qualified immunity.

The Supreme Court reaffirmed this holding in *Filarsky v. Delia*, 566 U.S. 377 (2012). There, a city hired a private attorney to conduct an internal investigation of a city employee. In concluding that the attorney was entitled to assert qualified immunity, the Court noted a strong common law tradition of immunizing "actions taken while [a private individual is]

15

engaged in public service on a temporary or occasional basis." *Id.* at 388. The Court emphasized that the attorney's work was distinct from the role of the private prison guard at issue in *Richardson*. Qualified immunity was not available in *Richardson* because, unlike an agency hiring an attorney, private prison employees are part of "a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms." *Filarsky*, 566 U.S. at 393 (quoting *Richardson*, 521 U.S. at 413).

Since *Filarsky*, the only court of appeals to address whether private prison doctors are entitled to assert qualified immunity is the Sixth Circuit.[5] In *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012), the court concluded that the qualified immunity defense was not available to a private prison psychiatrist facing a § 1983 suit for deliberate indifference to a suicidal prisoner's serious medical needs. The court based this conclusion on a determination that there are no special common law immunities afforded to doctors working for the state. *Id.* at 703. Thus, there is no "firmly rooted tradition" of immunity as required by *Richardson* and *Filarsky*. *Id.* at 704. The Sixth Circuit reaffirmed this holding a year later in a case involving similar facts. *See Lee v. Willey*, 543 F. App'x 503, 507 (6th Cir. 2013); *see also Hinson v. Edmond*,

---

[5] The First Circuit has not yet addressed *Richardson* or *Filarsky*. In *Cady v. Cumberland County Jail*, C.A. No. 10-00512-NT, 2013 U.S. Dist. LEXIS 109195 (D. Me. March 22, 2013), a magistrate judge held that private prison doctors were not entitled to assert qualified immunity in light of *Richardson* and *Filarsky*, concluding that these cases had implicitly supplanted the First Circuit's standard announced in *Frazier*. *Id.* at *101–02. On appeal, the First Circuit declined to address this conclusion, affirming instead on the grounds that the doctors would not be entitled to qualified immunity even if allowed to raise it. *Cady v. Walsh*, 753 F.3d 348, 350 (1st Cir. 2014).

16

192 F.3d 1342, 1347 (11th Cir. 1999) (holding after *Richardson* that a privately employed prison physician could not assert qualified immunity).

Applying *Richardson* and *Filarsky* to this case shows that Dr. Groblewski is not entitled to assert qualified immunity. Much like the guards in *Richardson*, Dr. Groblewski works for a large private firm. MPCH is "systematically organized to perform a major administrative task"—*i.e.* managing prison healthcare—"for profit." *Richardson*, 521 U.S. at 409. MPCH is solely responsible for providing medical services to DOC inmates; the DOC does not direct or supervise these services. *PSOF at ¶ 94*. Because MPCH is subject to the same competitive market pressures discussed in *Richardson, id.* at 410, its medical providers cannot assert qualified immunity.

### B. Dr. Groblewski is not entitled to qualified immunity on the merits

Even if the qualified immunity defense were available to him, Dr. Groblewski would not be entitled to it.

The same factual disputes about whether Dr. Groblewski denied Ms. Zingg's constitutional right to adequate medical care preclude summary judgment on the basis of qualified immunity. *See, e.g., Kelley v. LaForce,* 288 F.3d 1, 9 (1st Cir. 2002) (reversing summary judgment for defendants where there was a "material factual dispute as to whether the defendants' conduct was reasonable so as to entitle them to immunity"); *Swain v. Spinney,* 117 F.3d 1, 9-10 (1st Cir. 1997) (finding summary judgment based on qualified immunity inappropriate where question of whether reasonable official "could have believed his actions were in accord of constitutional rights" hinged on "factual issues, potentially turning on credibility"). If accepted by the jury, Plaintiff's version of events shows that Dr. Groblewski

deliberately refused to provide necessary treatment for a severe medical condition without any medical justification. Because this conduct violated Ms. Zingg's clearly established right to such treatment, Dr. Groblewski is not entitled to qualified immunity.

### IV. MPCH is liable under *Monell* for Dr. Groblewski's non-formulary decisions

Because Dr. Groblewski was the final decisionmaker for MPCH with respect to non-formulary medication requests, including PA Casella's request for Humira, *PSOF at ¶ 38*, MPCH is liable for his decision to deny this request.

"[A] municipality 'may be liable under [section 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.'" *Haley v. City of Boston*, 657 F.3d 39, 51 (1st Cir. 2011) (citations omitted).[6] "'[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.'" *Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986)). Municipal liability attaches when the constitutional violation results from the decision or order of an official with "final authority to establish municipal policy with respect to the action ordered." *Id.* (citing *Pembaur,* 475 U.S. at 481).[7]

---

[6] Although the First Circuit "has not expressly held that private entities should be treated analogously to municipalities for the purpose of § 1983 liability," *Leavitt*, 645 F.3d at 504 n.30, this is the consensus among the other circuit courts. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 & n.2 (7th Cir. 2014).

[7] Plaintiff does not rely on the theories of *Monell* liability discussed in Defendants' memorandum, which concern ongoing policies or practices as opposed to a discrete order or decision of a policy maker. Similarly, Plaintiff does not claim that Dr. Groblewski is liable as a supervisor for the actions of another. As discussed, he is liable for his own actions and inactions with respect to Ms. Zingg's treatment.

The plaintiff in *Welch,* a police detective, alleged that the chief of police unlawfully retaliated against him for exercising his First Amendment rights by denying plaintiff's reappointment to a specialist position. *Welch,* 542 F.3d at 936. This decision was solely within the police chief's discretion; he was the final policymaking official with respect to the reappointment of specialists. *Id.* at 942. The First Circuit held that the Town could be liable for the police chief's decision not to reappoint the plaintiff if that decision violated the plaintiff's constitutional rights. *Id.*

In this case, Dr. Groblewski had final authority to approve or deny non-formulary requests. He personally reviewed and made the final decision about every non-formulary request made by MPCH practitioners throughout the DOC system. His decision to deny Ms. Zingg the non-formulary medication requested for her was not directed or subject to overrule by any other authority at MPCH. Accordingly, MPCH is liable for this decision if it violated Ms. Zingg's rights.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion for Partial Summary Judgment in its entirety.

        Respectfully Submitted,

        **PLAINTIFF,**
        JENNA ZINGG,
        By her attorneys,


        /s/ David Milton
        Howard Friedman, BBO #180080
        David Milton, BBO #668908
        LAW OFFICES OF HOWARD
        FRIEDMAN, P.C.
        90 Canal Street, Fifth Floor
        Boston, MA 02114
        (617) 742-4100
        hfriedman@civil-rights-law.com
        dmilton@civil-rights-law.com

Date: January 31, 2017

**CERTIFICATE OF SERVICE**

I certify that on this day I caused a true copy of the above document to be served upon the attorney of record for all parties via CM/ECF.

Date: January 31, 2017   /s/ David Milton
                                    David Milton