UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | * | |
| JENNA ZINGG, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| THOMAS GROBLEWSKI and | * | Civil Action No. 15-cv-10771-ADB |
| MASSACHUSETTS PARTNERSHIP FOR | * | |
| CORRECTIONAL HEALTHCARE, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

This case concerns the medical treatment of Plaintiff Jenna Zingg, who was held pending trial in the Massachusetts Correctional Institute–Framingham ("MCI–Framingham") for approximately six months. She has sued Defendants Thomas Groblewski and the Massachusetts Partnership for Correctional Healthcare ("MPCH") for common law negligence and under 42 U.S.C. § 1983, alleging that they acted with deliberate indifference to her serious medical needs in violation of the Eighth and Fourteenth Amendments by failing to adequately care for her psoriasis and psoriatic arthritis. Defendants now seek partial summary judgment on the § 1983 claim. For the reasons that follow, Defendants' motion is ALLOWED.

I.      BACKGROUND

Because this is Defendants' motion for summary judgment, the Court must construe the facts in the light most favorable to Plaintiff, drawing all reasonable inferences in her favor. See

1

Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161 (1st Cir. 2006). Accordingly, the factual summary that follows is culled from Plaintiff's statement of facts ("Pl. Facts") [ECF No. 56] and those portions of Plaintiff's response to Defendants' facts ("Pl. Resp.") [ECF No. 55] that indicate the lack of a factual dispute. Additional facts are reserved for later discussion.

A.    Plaintiff's History with Psoriasis

Plaintiff was a pretrial detainee in MCI–Framingham from March 12, 2013, to September 5, 2013. Pl. Facts ¶ 1. Before entering that facility, she had a long history of severe psoriasis dating back to 2003. Id. ¶ 2. Psoriasis is a chronic inflammatory condition that causes red, scaly plaques to form on the skin. Id. ¶¶ 3–4. These plaques are often itchy and painful. Id. ¶ 4. Plaintiff had suffered from numerous forms of psoriasis that at times covered up to 30 percent of her skin. Id. ¶ 6–7. She also had a history of joint pain and swelling, which was probably a form of psoriatic arthritis. Id. ¶¶ 14–15.

There are at least two types of drugs used to treat psoriasis: topical medications, which are applied to the skin, and "systemic" medications, which are internal and target the immune system. See id. ¶¶ 9, 11. Prior to entering MCI–Framingham, Plaintiff had tried various topical treatments for her condition, including one weaker drug, a vitamin D analog called Dovonex, and one stronger drug, a steroid called clobetasol. Id. ¶ 9. These topical treatments failed to control her psoriasis. Id. ¶ 10. She had also tried a systemic drug called methotrexate, but it caused her severe gastrointestinal side effects. Id. ¶ 11.

Plaintiff responded well, however, to a systemic drug called Humira. Id. ¶ 12, 19. Humira works by suppressing the immune system. Id. ¶ 13. Although this increases a patient's risk of infection, with proper screening and monitoring Humira can be used safely. Id. While on Humira, Plaintiff's psoriasis was well-controlled and her skin was mostly clear of plaques. Id. ¶

12, 19. Plaintiff's joint pain and swelling also subsided when she was on Humira. Id. ¶ 15, 19. Plaintiff had been taking Humira continuously for approximately 10 months when she entered MCI–Framingham. Id. ¶ 18.

### B. Relationship Between MPCH, Dr. Groblewski, and Department of Corrections

During Plaintiff's pretrial detention, two different contractors oversaw the medical care for prisoners housed at Department of Correction ("DOC") facilities, including MCI–Framingham. See Pl. Resp. ¶¶ 2–5. Prior to July 1, 2013, UMass Correctional Healthcare ("UMass"), which is not a party to this case, was the medical contractor. Id. ¶¶ 2–3. As of July 1, 2013, Defendant MPCH took over those duties, entering into a contract with DOC to provide all medical and mental health services to those being held in DOC facilities. Id. ¶ 4.

Defendant Groblewski is the statewide medical director for MPCH and has held this position since July 1, 2013. Id. ¶ 6. Prior to this position, Dr. Groblewski was the statewide medical director for UMass. Id. Thus, at all times relevant to this case, Dr. Groblewski was the statewide medical director for the contractor in charge of providing medical services to those housed in DOC facilities. See id.

### C. Plaintiff's Treatment at MCI–Framingham

Plaintiff's first medical examination at MCI–Framingham occurred about nine days after she entered the facility, on March 21, 2013. Pl. Facts ¶ 20. During this exam, a nurse practitioner noted Plaintiff's history of failed psoriasis treatments and that her condition was "well-controlled on Humira." Id. It was also noted that Plaintiff was due for her next Humira shot on March 26, 2013. Id.

On April 1, 2013, Patricia Casella, a physician's assistant ("PA"), submitted a request to refer Plaintiff to a rheumatologist at Lemuel Shattuck Hospital for the purpose of developing a

plan of care, to include treatment for her psoriasis. Id. ¶ 21. On April 19, 2013, this request was denied, although it is unclear on this record by whom, with the recommendation that Plaintiff continue with on-site medical treatment "using an existing formulary."[1] Id. ¶ 24; ECF No. 46, Ex. 10 at 36.

PA Casella appears to have been Plaintiff's primary point of contact with prison medical services during her period of incarceration. At a visit on April 25, 2013, PA Casella observed small spots of psoriasis on both of Plaintiff's elbows and noted that Plaintiff reported experiencing elbow pain since being off Humira. Pl. Facts ¶ 25. By this time, PA Casella had received Plaintiff's medical records from her regular dermatologist, which documented Plaintiff's history of failed psoriasis treatments and her positive response to Humira. Id. ¶¶ 26, 74–76. PA Casella nonetheless wrote that her plan was to prescribe clobetasol and a prescription shampoo. Id. ¶ 27.

Meanwhile, between April and August 2013, Plaintiff submitted at least 15 "sick call request" forms—or "sick slips"—that described her worsening condition. Id. ¶¶ 22, 23, 30, 31, 32, 46, 48. The first, submitted on April 10, 2013, noted that she was two weeks overdue for her scheduled Humira shot and that her psoriasis had already begun to return. Id. ¶ 22. By early July 2013, she described plaques "all over" her body, covering her arms, armpits, thigs, hands, ears, feet, vaginal area, buttocks, and other areas, such that it hurt to walk or shower. Id. ¶ 31.

---

[1] In this context, "formulary" refers to a list of medications that have been pre-approved to administer to patients. See Formulary, MERRIAM-WEBSTER ONLINE DICTIONARY (medical definition), https://www.merriam-webster.com/dictionary/formulary (last accessed September 21, 2017). See also [ECF No. 44-4] (UMass Correctional Health Plaque Psoriasis Protocol (listing formulary and non-formulary medications)); [ECF No. 44-6] (The Commonwealth of Massachusetts State Office of Pharmacy Services, Correctional Facilities Drug Formulary (2013) (similar)).

PA Casella saw Plaintiff on July 12, 2013, noting the extensive presence of psoriatic plaques and joint pain. Id. ¶¶ 33–34. After this visit, PA Casella prescribed two medications, Humira and Dovonex, neither of which was on the drug formulary used by Defendant MPCH. Id. ¶ 35. In order to obtain approval for each of these drugs, PA Casella was required to—and did—fill out non-formulary request forms. Id. Each form described Plaintiff's history of moderate to severe psoriasis, her lack of success on clobetasol over the prior months, her positive response to Humira before entering MCI–Framingham, and the severity of her then-current condition. Id. ¶ 36–37.

As part of his job, Dr. Groblewski reviewed virtually all non-formulary requests made by MPCH practitioners, including the two just described. Id. ¶ 38–39. On July 15, 2013, he approved the request for Dovonex, but denied the one for Humira. Id. ¶ 41. This was Dr. Groblewski's first contact with Plaintiff's case. At this point, Dr. Groblewski had not examined Plaintiff or reviewed her medical records, and he knew nothing about her other than what PA Casella had included in the non-formulary request forms. Id. ¶¶ 42–43, 69, 73.

Plaintiff's condition continued to worsen. Id. ¶ 45. By late July 2013, Plaintiff's psoriasis had begun to interfere with her daily activities. Id. ¶ 49. She experienced pain when sitting, walking, washing herself, and getting dressed. Id. ¶¶ 49, 50. Plaintiff also began to exhibit changes in behavior and mood. Id. ¶ 51. She became depressed, had trouble sleeping, and generally avoided others. Id. ¶¶ 32, 52, 53, 56. On July 30, 2013, a corrections officer expressed concern to a social worker intern that Plaintiff had become more irritable and stayed in her cell. Id. ¶ 54.

On August 1, 2013, PA Casella submitted a referral request for Plaintiff to see a dermatologist at the outpatient clinic at Lemuel Shattuck Hospital. Id. ¶ 55. MPCH approved the

request on August 6, 2013. Id. Plaintiff was treated at the clinic on August 9, 2013, at which time psoriatic plaques covered 30 percent of Plaintiff's body. Id. ¶ 58–59. She was diagnosed with severe psoriasis and mild psoriatic arthritis, admitted as an inpatient, screened for risk of infection, and given an initial dose of Humira on August 11, 2013. Id. ¶¶ 59–60.

Plaintiff was discharged and returned to MCI–Framingham the next day with a plan to follow up with the rheumatology clinic for further evaluation, which did not occur. Id. ¶ 61–63. She did, however, receive a Humira shot at the prison on August 27, 2013. Id. ¶ 64. By September 3, 2013, Plaintiff had experienced significant improvement in her condition, and, on September 5, 2013, she was released from MCI–Framingham. Id. ¶¶ 63–64.

### D. Procedural History

Plaintiff commenced this case in March 2015 and filed an Amended Complaint in February 2016, naming as Defendants Dr. Groblewski in his individual capacity and MPCH. [ECF Nos. 1, 22 at 2]. The Amended Complaint includes two counts against both Defendants, with Count One arising under § 1983 and Count Two sounding in common law negligence. [ECF No. 22 at 9–10]. The Amended Complaint seeks compensatory and punitive damages, as well as costs and attorney's fees. Id. at 10–11.

In February 2016, the case was referred to a medical malpractice tribunal. [ECF No. 26]. Defendants represent that the case passed the tribunal as to both Defendants on September 28, 2016. [ECF No. 42 at 2]. Meanwhile, fact discovery was completed in August 2016, and expert discovery was completed in November 2016. [ECF Nos. 35–38, 42 at 2].

Defendants then moved for partial summary judgment on Count One. [ECF No. 41]. Plaintiff opposed the motion in January 2017 [ECF No. 57], and Defendants filed a reply brief [ECF No. 62]. The motion is now ripe for adjudication.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

At summary judgment, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Feeney, 464 F.3d at 161. Summary judgment is appropriate if the record shows there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Id. (citing Fed. R. Civ. P. 56(c)). A dispute is considered genuine if a reasonable jury, drawing favorable inferences, could resolve it in favor of the non-moving party. Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). A party succeeds in showing the lack of a genuine dispute of material fact when she affirmatively produces evidence that negates an essential element of the non-moving party's claim, or, using evidentiary materials in the record, demonstrates that the non-moving party will be unable to carry her burden of persuasion at trial. Id. at 4–5.

### B.    Constitutionally Inadequate Care

Count One, Plaintiff's § 1983 claim, alleges a violation of the Eighth Amendment, which applies to the states through the Fourteenth Amendment, see Torraco v. Maloney, 923 F.2d 231, 233 n.3 (1991). In this context, the Eighth Amendment protects prisoners from "deliberate indifference to serious medical needs," Feeney, 464 F.3d at 161–62 (quoting Estelle v. Gamble, 429 U.S. 97, 105–06 (1976)), meaning a violation arises when medical care is "so inadequate as to shock the conscience," id. at 162 (quoting Torraco, 923 F.2d at 235).

To succeed on such a claim, a plaintiff must satisfy both an objective and subjective inquiry.[2] Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015) (quoting Leavitt v. Corr. Med. Servs., 645

---

[2] Although described in two prongs, the First Circuit has recognized that there is often analytical and evidentiary overlap between the prongs. See Kosilek v. Spencer, 774 F.3d 63, 83 n.7 (1st

F.3d 484, 497 (1st Cir. 2011)). The objective prong requires proof of a sufficiently serious medical need. See id. The need must be "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (en banc), cert. denied, 135 S. Ct. 2059 (2015) (quoting Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir.1990)).

The subjective prong requires the plaintiff to show that prison officials possessed a sufficiently culpable state of mind—namely, deliberate indifference to the claimant's health or safety. Perry, 782 F.3d at 78. "For purposes of this subjective prong, deliberate indifference 'defines a narrow band of conduct' and requires evidence that the failure in treatment was purposeful." Kosilek, 774 F.3d at 83 (citation omitted). "The obvious case would be a denial of needed medical treatment in order to punish the inmate." Feeney, 464 F.3d at 162 (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir.1993)). Yet deliberate indifference may also reside in "wanton" or "reckless" actions, although recklessness is to be understood "not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable." Id.

Under this formulation, an "inadvertent failure to provide adequate medical care" does not give rise to a constitutional violation because it "cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" Estelle, 429 U.S. at 105–06. Similarly, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [Supreme Court case law]

---

Cir. 2014) (en banc), cert. denied 135 S. Ct. 2059 (2015) (describing how adequacy of care is germane both to objective need for surgery and to alleged deliberate indifference to that need).

be condemned as the infliction of punishment." Farmer v. Brennan, 511 U.S. 825, 838 (1994). Thus, substandard treatment, "even to the point of malpractice," is not enough to show an Eighth Amendment violation. Feeney, 464 F.3d at 162 (quoting Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir. 1981)). This is because the Constitution "does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing." Kosilek, 774 F.3d at 82. Accordingly, when the treatment simply reflects a disagreement on the appropriate course of treatment, such a dispute may present a colorable claim of negligence, but will fall short of alleging a constitutional violation. Id. See also Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987) ("Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, [the Court] will not second guess the doctors.").

## III.    ANALYSIS

Defendants do not dispute that Plaintiff, at all times relevant to this case, had a serious medical condition that satisfies the objective prong of the inquiry. [ECF No. 42 at 14]. Instead, they argue that the undisputed facts show their actions in treating Plaintiff do not rise to the level of deliberate indifference, under the subjective prong, as required to make out a constitutional claim. Id. They also argue that Dr. Groblewski is entitled to qualified immunity. Id. at 18. Because the Court agrees with Defendants' first argument, it does not reach the second.

### A.    Constitutionally Inadequate Care—Dr. Groblewski

As discussed, Dr. Groblewski denied the request for Humira and treated Plaintiff instead with a different non-formulary medication until her inpatient admission on August 9, 2013, which resulted in Humira being restarted on August 11, 2013. The issue is thus whether Dr.

Groblewski acted with deliberate indifference when he decided to initially try a second topical drug that Plaintiff's medical records showed had previously been ineffective.

Dr. Groblewski argues that he provided Plaintiff with adequate medical care such that she cannot satisfy the subjective prong of the test. Id. at 14. Plaintiff's arguments in response fall into essentially three categories: (1) because it was obvious that the continued use of topical medications would be ineffective in treating Plaintiff's condition, Dr. Groblewski's decision to prescribe Dovonex amounted to providing "no treatment at all" [ECF No. 57 at 4–5]; (2) Dr. Groblewski showed deliberate indifference by failing to obtain more information about Plaintiff before denying Humira, id. at 5–8; and (3) Dr. Groblewski's proffered reasons for denying Humira are not credible, and a reasonable fact-finder could infer that he made this decision for financial reasons, id. at 8–14.

"A state-of-mind issue such as the existence of deliberate indifference usually presents a jury question." Torraco, 923 F.2d at 234. "However, where there is no evidence of treatment so inadequate as to shock the conscience, let alone that any deficiency was intentional, or evidence of acts or omissions so dangerous (in respect to health or safety) that a defendant's knowledge of a large risk can be inferred, summary judgment is appropriate." Id. (citations and internal quotation marks omitted).

In this case, even construing the facts in the light most favorable to Plaintiff and making all reasonable inferences in her favor, the record would not permit a reasonable fact-finder to conclude that Dr. Groblewski's treatment of Plaintiff was so inadequate as to "shock the conscience," id., or that he "[knew] of and disregard[ed] an excessive risk to inmate health or safety," Farmer, 511 U.S. at 837. Dr. Groblewski did provide treatment by prescribing Dovonex. Thus, although he did not initially approve Humira, he did prescribe a course of treatment that

was consistent with a recommendation by PA Casella and with prison protocol. See Pl. Resp. at 4–5 (undisputed that treatment protocol "has two steps for topical treatments before the two steps for systemic medications"). "The courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment." Watson, 984 F.2d at 540. Further, the record is devoid of evidence that Dr. Groblewski chose this course of treatment knowing of, or consciously disregarding, an excessive risk to Plaintiff's health. While there was a risk that the treatment would not work, Dr. Groblewski's decision to try a different treatment first (even one that, unbeknownst to him, had failed to alleviate Plaintiff's symptoms in the past) does not rise to the level of a constitutional violation, particularly when Plaintiff was treated with Humira once it became evident that the Dovonex was not working. Without some indication that Dr. Groblewski actually knew the Dovonex treatment would fail or subjectively believed it was very likely to fail, Plaintiff cannot succeed in showing that he acted with deliberate indifference. See Farmer, 511 U.S. at 837, 839.

Plaintiff claims "it was obvious" that clobetasol was a more potent topical medication than Dovonex, and therefore Dr. Groblewski's choice to treat Plaintiff with a lower-potency medication after a higher-potency one had proven unsuccessful was, in the words of Plaintiff's expert, akin to "shooting a pistol at an armored car after a missile had failed." [ECF No. 57 at 5]; Pl. Facts ¶¶ 43, 77. Even assuming this to be true, however, the record still fails to demonstrate deliberate indifference for two related reasons.

First, with regard to Dr. Groblewski's subjective state of mind, there is nothing in the record to support an inference that the decision to try Dovonex was intended to harm Plaintiff, or that he wantonly or recklessly ignored a known risk of Plaintiff's health—particularly when this course of treatment was both recommended by PA Casella and consistent with the prison

protocol requiring a patient to try and fail two topical treatments before systemic drugs are considered. See Pl. Resp. at 4–5. Also, it is undisputed that Humira suppresses a patient's immune system, thereby making the patient more susceptible to infections. Pl. Facts ¶ 13; Pl. Resp. at 7–8. Plaintiff acknowledges that Humira is "not prescribed lightly." [ECF No. 57 at 6]. In a public prison setting, Dr. Groblewski's decision to delay prescribing a drug with an increased risk of infection for a short period of time (less than a month) to determine whether a less-drastic remedy would suffice cannot reasonably be interpreted as evincing a "deliberate intent to harm" or "wanton disregard" for a prisoner's health, see Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011)—at least not without additional facts to support such a conclusion.

Second, even assuming, as Plaintiff urges, that Dovonex was unlikely to relieve Plaintiff's symptoms, Plaintiff has not produced any evidence that Dr. Groblewski intended for Dovonex to supplant, rather than supplement, Plaintiff's clobetasol treatment. In fact, the record supports the opposite conclusion—that the two drugs were intended to be used together. See Pl. Resp. at 46–50. Plaintiff does not contend, nor is there evidence to show, that Dr. Groblewski's chosen treatment, a combination of Dovonex and clobetasol, would be weaker or less effective than a straight clobetasol treatment. Accordingly, the "impending harm," Watson, 984 F.2d at 540, facing Plaintiff in the wake of Dr. Groblewski's treatment decision was far from the foregone conclusion that Plaintiff makes it out to be.

Once it became evident, after approximately three weeks, that the combination of clobetasol and Dovonex was not working, Plaintiff was treated at the Lemuel Shattuck Hospital clinic where, on August 11, 2013, she received a dose of Humira. Pl. Facts ¶¶ 58, 60. She later received a second Humira shot at the prison on August 27, 2013, shortly prior to her release. Id. ¶ 64. Again, these undisputed events, following in sequence from Dr. Groblewski's initial decision

to prescribe Dovonex rather than Humira, demonstrate "not the absence of help, but the choice of a certain course of treatment." Sires, 834 F.2d at 13. Although a reasonable fact-finder could fault Dr. Groblewski for the delay in getting Plaintiff treated with Humira, the delay under the circumstances of this case does not rise to the level of a constitutional violation. See Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); DesRosiers v. Moran, 949 F.2d 15, 20 (1st Cir. 1991) ("[A] claim of inadequate medical treatment which reflects no more than a disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment."); Miranda v. Munoz, 770 F.2d 255, 259 (1st Cir. 1985) ("[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law[.]" (citations and internal quotation marks omitted)).

This reluctance to find a constitutional violation where a prisoner has received adequate, although arguably not ideal, medical treatment finds ample support in the case law of this circuit. For instance, in Ruiz-Rosa v. Rullan, 485 F.3d 150, 151, 156 (1st Cir. 2007), after a prisoner died of septicemia while in custody, the plaintiff presented an expert who opined that the prisoner "was given ineffective antibiotics, that doses of the antibiotics which were prescribed were missed, that the staff failed to keep adequate medical records, and that the staff failed to respond when [the prisoner's] condition worsened." Yet, the First Circuit found that record insufficient to survive summary judgment on the issue of deliberate indifference because there was no evidence that the treating doctor "was aware that the antibiotic he prescribed was ineffective and would pose a substantial risk of harm to [the prisoner]." Id. at 156.

Similarly, in <u>Feeney</u>, 464 F.3d at 162, the First Circuit affirmed a grant of summary judgment for defendants when prison medical officials delayed, for about 22 months, providing the plaintiff with orthopedic footwear that had previously been prescribed to him. The plaintiff's claim fell short of an Eighth Amendment violation in part because, during that 22-month span, he was examined by several medical professionals and received other treatments for his symptoms. <u>Id.</u> While the record may have "reflected poor judgment on the part of some defendants," it did not rise to the level of deliberate indifference in the constitutional sense. <u>Id.</u> at 163. Additionally, in <u>Torraco</u>, 923 F.2d at 233–34, a deliberate indifference claim failed where the plaintiff's son committed suicide in prison after prison officials neglected to provide the son with psychiatric care or take precautionary measures such as placing him in a "suicide cell." The case did not survive summary judgment on the § 1983 claim (although it "very well" may have presented a claim of negligence) because prison officials provided individual counseling to the inmate and were responsive when he expressed a need for mental health attention. <u>Id.</u> at 235–36.

This case resembles <u>Ruiz-Rosa</u>, <u>Feeney</u>, and <u>Torraco</u> in the sense that Plaintiff was not denied treatment outright, but rather was provided one course of treatment over her preferred course of treatment—and even then, only for less than a month, after which time her medication was changed and her condition quickly improved. Those facts are insufficient to prove an Eighth Amendment violation because prison administrators are under no "duty to provide care that is ideal, or of the prisoner's choosing." <u>Kosilek</u>, 774 F.3d at 82. The undisputed facts show a conservative, but ultimately successful, course of treatment. At bottom, Dr. Groblewski did not make a "'wanton' decision[] to deny or delay care" or act with "actual knowledge of impending harm, easily preventable." <u>Watson</u>, 984 F.2d at 540.

Because Dr. Groblewski did not refuse to treat Plaintiff outright and because Plaintiff received follow-up treatment once it became clear that clobetasol and Dovonex together were not working, this case is readily distinguishable from those cases in which the First Circuit has found a colorable claim of deliberate indifference. For example, in Perry, 782 F.3d at 80, summary judgment was inappropriate because a fact-finder could have determined that although the inmate alerted officials to his broken jaw, they conducted only cursory examinations of him and withheld treatment, telling him to "sleep it off." Similarly, in Leavitt, 645 F.3d at 499, the record would have permitted a fact-finder to conclude that a physician's assistant acted with deliberate indifference when he failed to examine the viral load report of an HIV-positive inmate. In contrast, here it is undisputed that Dr. Groblewski did not became aware of Plaintiff's condition until July 15, 2013, at which point he prescribed an additional medication, Dovonex. Her condition then was monitored, up to and including her admission to the clinic on August 11, 2013, at which point she received a Humira shot, followed by the administration of a second Humira shot at MCI–Framingham on August 27, 2013. These undisputed facts surrounding Dr. Groblewski's chosen course of treatment foreclose a finding of the type of "callous disregard in the face of a pressing medical emergency" or "treatment so inadequate as to shock the conscience" or "deficiency [in treatment that] was intentional" that is required to support a finding of deliberate indifference. Sires, 834 F.2d at 13.

Even so, Plaintiff asserts that Dr. Groblewski's decision to deny Humira amounted to making no decision at all in that it was based on rote adherence to the MPCH formulary without any examination of Plaintiff or her medical records, and that this is enough to establish deliberate indifference. [ECF No. 57 at 5, 10]. For support, she primarily relies on Johnson v. Wright, 412 F.3d 398, 406 (2d Cir. 2005), where the court noted that "a jury could find that the defendants

acted with deliberate indifference by reflexively relying on the medical soundness" of treatment guidelines "when they had been put on notice that the medically appropriate decision could be, instead, to depart" from said guidelines. Two important factors distinguish this case from Johnson and cases like it: the time line and the nature of the recommendation that Plaintiff receive a particular course of treatment. In Johnson, the prisoner was denied a specific Hepatitis C treatment for about 18 months "in the face of the unanimous, express, and repeated recommendations of plaintiff's treating physicians" that he receive the withheld treatment. Id. at 400–02, 406. Here, less than a month elapsed between Dr. Groblewski's initial decision to deny Humira in favor of a second topical medication and Plaintiff's first dose of Humira while in custody. See Pl. Facts ¶¶ 41, 60. Further, there is no evidence of "unanimous" or "repeated" recommendations that Plaintiff receive Humira—only the one recommendation, by PA Casella, which was submitted at the same time as her recommendation that Plaintiff receive Dovonex. See id. ¶¶ 35–37. Nor is there any evidence that any other physician told Dr. Groblewski that they disagreed with his decision. Thus, the MPCH professional who had the most information about Plaintiff's condition recommended two types of treatment. Dr. Groblewski, rather than approving both, chose the one that was less drastic and fit into the MPCH treatment protocol for Plaintiff's particular disease, and he avoided giving a drug in a prison setting that indisputably would have put Plaintiff at a higher risk of infection. See Pl. Facts ¶¶ 85; Pl. Resp. at 4–5, 7–8. And again, although the Humira recommendation was initially rejected, it was, after less than a month on Dovonex, ultimately followed. Pl. Facts ¶ 60. See also Pl. Resp. at 74–75 (acknowledging that Dovonex was prescribed "pending Humira approval").

Finally, Plaintiff argues that Dr. Groblewski's stated reasons for denying Humira are not credible, and instead the evidence supports the inference that he denied Humira for financial

reasons. [ECF No. 57 at 8, 11–13]. The suggestion that Dr. Groblewski denied Humira for financial reasons is not reasonably inferable from the evidence in the record. Although a reasonable fact-finder could accept the basic proposition that Humira is more expensive than either clobetasol or Dovonex, see Pl. Facts ¶ 17, there is no evidence that this cost differential had any bearing on Dr. Groblewski's decision regarding how to treat Plaintiff. Further, it is undisputed that Plaintiff received two doses of Humira while in DOC custody, including one shortly before she left DOC custody, Pl. Facts ¶¶ 60, 64, and that MPCH and UMass approved more than 70 new prescriptions for Humira or similar medications for persons in DOC custody in 2013 alone, Pl. Resp. at 7–8, 64. These facts belie the assertion that Humira was systemically denied to save money.

Even if a rational fact-finder could conclude that the cost differential was a factor in Dr. Groblewski's decision to delay the Humira treatment until the combination of Dovonex and clobetasol proved unsuccessful, that alone would not necessarily give rise to a claim of deliberate indifference. See, e.g., Morris v. Livingston, 739 F.3d 740, 748 (5th Cir. 2014), cert. denied, 134 S. Ct. 2734 (2014) (noting that deliberate indifference standard "does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society"); Winslow v. Prison Health Servs., 406 F. App'x 671, 674 (3d Cir. 2011) (consideration of cost alone does not state a claim for deliberate indifference because "prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment"); Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care[.]"). This is particularly true where nothing in the record permits an inference that cost considerations overrode Dr.

Groblewski's professional medical judgment. See Battista, 645 F.3d at 453 (noting that Supreme Court's Eighth Amendment jurisprudence "leave[s] ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources"); DesRosiers, 949 F.2d at 19 ("In evaluating the quality of medical care in an institutional setting, courts must fairly weigh the practical constraints facing prison officials."). Nor would the fact that Dr. Groblewski considered cost when choosing Plaintiff's treatment regimen, on its own, solve the defect identified above— that the record is devoid of evidence to support an inference that Dr. Groblewski knew of or ignored an obvious risk to Plaintiff's health in choosing the course of treatment.[3] See, e.g., Brady v. Aldridge, 493 F. App'x 790, 791 (7th Cir. 2012) (rejecting deliberate indifference claim based on allegation that prison dentist's choice of treatment was motivated by cost-savings rather than professional judgment because plaintiff failed to plausibly allege that dentist recklessly or intentionally harmed him).

For these reasons, summary judgment is appropriate in Defendants' favor with respect to the § 1983 claim against Dr. Groblewski.

### B.    Constitutionally Inadequate Care—MPCH

Given the above discussion of Dr. Groblewski's conduct, this record cannot support the imposition of § 1983 liability against MPCH. The Court will assume for purposes of argument that MPCH, a private contractor, could be held liable under § 1983 on a theory resembling municipal liability—a question not expressly resolved in the First Circuit, see Leavitt, 645 F.3d at 504 n.30. Even so, "[w]here, as here, there is no constitutional violation by the employees of

---

[3] With respect to Dr. Groblewski's other potential motivations, Plaintiff's argument asks the Court to make credibility determinations, which is not permitted at summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

the municipality, there can be no liability predicated on municipal policy or custom." Id. at 504. For the reasons already discussed, Dr. Groblewski did not violate Plaintiff's constitutional rights, and Plaintiff does not attempt to show a constitutional violation by any other employee of MPCH. Plaintiff offers no argument for imposing liability on MPCH absent a finding of wrongdoing by Dr. Groblewski. [See ECF No. 57 at 18–19]. Accordingly, Plaintiff's § 1983 claim against MPCH cannot survive Defendants' motion for summary judgment.

### C.      Remaining negligence claim

Having granted summary judgment in Defendants' favor with respect to the § 1983 claim, only Plaintiff's common law negligence claim remains. The parties have not yet expressed a position as to whether the Court should exercise supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367.

A district court "may decline to exercise supplemental jurisdiction" once it "has dismissed all claims over which it has original jurisdiction." Eves v. LePage, 842 F.3d 133, 146 (1st Cir. 2016) (quoting 28 U.S.C. § 1367(c)(3)). Among the factors relevant to this decision are (1) whether assuming jurisdiction might promote "judicial economy" and "convenience," and (2) whether declining jurisdiction might promote "comity" or afford the parties a "surer-footed reading of applicable law" from state courts. Id. (quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)). The First Circuit has stated "that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors [from Gibbs] will point toward declining to exercise jurisdiction over the remaining state-law claims." Id. (quoting Rivera–Díaz v. Humana Ins. of P.R., Inc., 748 F.3d 387, 392 (1st Cir. 2014) (alteration in original)).

Here, unlike in "the usual case," the balance of <u>Gibbs</u> factors tips in favor of the Court exercising supplemental jurisdiction over Plaintiff's remaining negligence claim. There can be little doubt that this state law claim qualifies for supplemental jurisdiction under § 1367(a), as it derives from the same "common nucleus of operative fact," <u>Gibbs</u>, 383 U.S. at 725, as the § 1983 claim. Further, since this case originated in March 2015, the parties have completed fact and expert discovery to develop a robust factual record in this Court. Finally, the remaining negligence claim, based on the briefing so far, does not appear to present a novel or complex issue of law that would favor resolution by a state court. <u>See</u> <u>Cavallaro v. UMass Memorial Healthcare, Inc.</u>, 678 F.3d 1, 9 (1st Cir. 2012) (approving of district court exercising supplemental jurisdiction when "[t]he claim arises from the same nucleus of facts as the rest of plaintiffs' claims, the question is purely legal and, although perhaps novel, it is by no means complex"). Accordingly, the aims of judicial economy and convenience to the parties are furthered, and comity is not disserved, by the Court retaining jurisdiction over the negligence claim.

## IV.    CONCLUSION

Although the treatment given to Plaintiff may not have been optimal, the record before the Court would not permit a rational fact-finder to determine that Defendants provided Plaintiff with constitutionally inadequate care. Therefore, the Court must <u>ALLOW</u> Defendants' motion for partial summary judgment [ECF No. 41]. The Court will exercise supplemental jurisdiction over the remaining negligence count of the Amended Complaint.

SO ORDERED.

Dated: September 29, 2017                                    /s/ Allison D. Burroughs
                                                            ALLISON D. BURROUGHS
                                                            U.S. DISTRICT JUDGE